UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | | |
|---|---|---|
| HENRY MADRID CORTEZ, | ) | No. ED CV 16-673-PLA |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, ACTING | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on April 12, 2016, seeking review of the Commissioner's denial of his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") payments. The parties filed Consents to proceed before the undersigned Magistrate Judge on May 11, 2016, and June 6, 2016. Pursuant to the Court's Order, the parties filed a Joint Stipulation (alternatively "JS") on December 20, 2016, that addresses their positions concerning the disputed issue in the case. The Court has taken the Joint Stipulation under submission without oral argument.

/

## II.

## BACKGROUND

Plaintiff was born on April 28, 1961. [Administrative Record ("AR") at 31, 233, 242.] He has past relevant work experience as a hand packager; exhaust tender; truck driver; electrician helper; and laborer, stores.  [AR at 30-31, 73.]

On February 2, 2012, plaintiff protectively filed an application for a period of disability and DIB, and on February 8, 2012, he filed an application for SSI payments, alleging in both that he has been unable to work since October 1, 2009.  [AR at 23, 233-39, 240-50.]  After his applications were denied initially and upon reconsideration, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ").  [AR at 23, 151-52.]  A hearing was held on April 28, 2014, at which time plaintiff appeared represented by an attorney, and testified on his own behalf.[1]  [AR at 51-76.]  The same VE who had testified at the earlier September 20, 2013, hearing (see supra note 1), also testified.  [AR at 73-75.]  On May 23, 2014, the ALJ issued a decision concluding that plaintiff was not under a disability from October 1, 2009, the alleged onset date, through May 23, 2014, the date of the decision.  [AR at 23-32.]  Plaintiff requested review of the ALJ's decision by the Appeals Council.  [AR at 18.]  When the Appeals Council denied plaintiff's request for review on February 18, 2016 [AR at 1-6], the ALJ's decision became the final decision of the Commissioner.  See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam) (citations omitted).  This action followed.


## III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  Berry v. Astrue, 622

---

[1]   A hearing had previously been convened on September 20, 2013.  [AR at 44-50.]  Plaintiff inexplicably failed to appear for the hearing.  [AR at 46.]  The ALJ nevertheless took the testimony of a vocational expert ("VE").  [AR at 47-49.]

F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1159 (9th Cir. 2008) (citation and internal quotation marks omitted); Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998) (same).  When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (citation omitted); see Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (citation and internal quotation marks omitted).  "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Ryan, 528 F.3d at 1198 (citation and internal quotation marks omitted); see Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006) ("If the evidence can support either affirming or reversing the ALJ's conclusion, [the reviewing court] may not substitute [its] judgment for that of the ALJ.") (citation omitted).

## IV.

## THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

## A.    THE FIVE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821,

828 n.5 (9th Cir. 1995), as amended April 9, 1996.  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied.  Id.  If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id. If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id. If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform his past work; if so, the claimant is not disabled and the claim is denied.  Id.  The claimant has the burden of proving that he is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets this burden, a prima facie case of disability is established.  Id.  The Commissioner then bears the burden of establishing that the claimant is not disabled, because he can perform other substantial gainful work available in the national economy.  Id.  The determination of this issue comprises the fifth and final step in the sequential analysis.  20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

**B.     THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since October 1, 2009, the alleged onset date.[2] [AR at 25.] At step two, the ALJ concluded that plaintiff has the following severe impairments:

---

[2]   The ALJ concluded that plaintiff met the insured status requirements of the Social Security Act through December 31, 2014.  [AR at 25.]

> [D]egenerative disc disease at multiple levels of the lumbosacral spine with evidence of spasm, poorly controlled diabetes, mood disorder, not otherwise specified, methamphetamine use disorder[] in remission and rule out bipolar type II disorder.

[Id. (citations omitted).]   At step three, the ALJ determined that plaintiff does not have an impairment or a combination of impairments that meets or medically equals any of the impairments in the Listing.   [AR at 26.]   The ALJ further found that plaintiff retained the residual functional capacity ("RFC")[3] to perform light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b),[4] as follows:

> [Can] lift and carry 20 pounds occasionally, 10 pounds frequently, standing and walking for 6 hours in an 8-hour workday, sitting for 6 hours.  [Plaintiff] is limited to occasional postural activity, but has no other significant physical limitations. Mentally, he is limited to simple repetitive tasks with occasional contact with the public, coworkers and supervisors.

[Id.]   At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ concluded that plaintiff is able to perform his past relevant work as a hand packager as actually performed (Dictionary of Occupational Titles ("DOT") No. 920.587-018).  Because he had "some concern" that plaintiff's past work as a hand packager might not qualify as "past relevant work," the ALJ made an alternative finding at step five that there are other jobs existing in the national economy that plaintiff is also able to perform, including work as a "small products assembler" (DOT No. 739.687-030), "marker, II" (DOT No. 920.687-126), and "classifier" (DOT No. 361.687-014).  [AR at 31-31, 74-75.]  Accordingly, the ALJ determined that plaintiff was not disabled at any time from

---

[3]    RFC is what a claimant can still do despite existing exertional and nonexertional limitations.  See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity."  Massachi v. Astrue, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007) (citation omitted).

[4]    "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."  20 C.F.R. §§ 404.1567(b), 416.967(b).

the alleged onset date of October 1, 2009, through May 23, 2014, the date of the decision. [AR at 32.]

### V.

### THE ALJ'S DECISION

Plaintiff contends that the ALJ erred when he assessed plaintiff's RFC for the mental requirements of work limited to simple repetitive tasks with occasional contact with the public, coworkers, and supervisors. [JS at 4-5.] As set forth below, the Court agrees with plaintiff and remands for further proceedings.

### A.    MEDICAL OPINIONS

"There are three types of medical opinions in social security cases: those from treating physicians, examining physicians, and non-examining physicians." Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 692 (9th Cir. 2009); see also 20 C.F.R. §§ 404.1502, 404.1527. "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." Lester, 81 F.3d at 830; Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) (citing Ryan, 528 F.3d at 1198; Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1222 (9th Cir. 2010). "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830; Ryan, 528 F.3d at 1198.

"[T]he ALJ may only reject a treating or examining physician's uncontradicted medical opinion based on clear and convincing reasons." Carmickle, 533 F.3d at 1164 (citation and internal quotation marks omitted); Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006). "Where such an opinion is contradicted, however, it may be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Carmickle, 533 F.3d at 1164 (citation and internal quotation marks omitted); Ryan, 528 F.3d at 1198; Ghanim v. Colvin, 763 F.3d 1154, 1160-61 (9th Cir. 2014); Garrison, 759 F.3d at 1012. The ALJ can meet the requisite specific and legitimate standard "by setting out a detailed and thorough summary of the facts and

1  conflicting clinical evidence, stating his interpretation thereof, and making findings." <u>Reddick</u>, 157

2  F.3d at 725.  The ALJ "must set forth his own interpretations and explain why they, rather than the

3  [treating or examining] doctors', are correct."  <u>Id.</u>

4

5  **B.   ANALYSIS**

6         With respect to plaintiff's mental health treatment, the ALJ generally noted the following:

7         In the psychiatric realm, there is no record of [plaintiff] receiving any specialized
          psychiatric treatment or care at times material hereto.  Moreover, there is very little
8         mention of psychiatric symptoms or complaints in his medical treatment records.
          The only report in this regard I find is a report from April 2013 in which a psychiatric
9         health screening questionnaire was administered and [plaintiff's] score thereon was
          consistent with severe depression.  However, there is no evidence of any follow-up
10        in this regard.

11  [AR at 28 (citing AR at 532-33).]

12         Plaintiff underwent two state agency consultative mental health evaluations:  on May 28,

13  2012, Ibrahim Busnaina, M.D. conducted a complete psychiatric evaluation [AR at 368-72], and

14  on January 12, 2013, Ijeoma Ijeaku, M.D. conducted a complete psychiatric evaluation.  [AR at

15  482-87.]  The ALJ summarized these two reports:

16        The first [mental health examination] was undertaken on May 28, 2012.  The
          psychiatric consultant, based upon a psychiatric interview and a mental status
17        examination, diagnosed [plaintiff] with a mood disorder, not otherwise specified,
          methamphetamine use disorder, in remission, and a rule out bipolar II disorder.  He
18        also afforded [plaintiff] a global assessment of functioning score of 50, indicative of
          symptoms on the borderline between "moderate" and "serious."  Ultimately, he
19        opined that [plaintiff] had no limitations performing either simple or complex
          instructions, but had moderate to severe limitations in terms of interacting with
20        coworkers, colleagues and supervisors, as well as in handling stress in the
          workplace.  He also opined that [plaintiff] had moderate limitations maintaining focus
21        and concentration and in dealing with changes in the work setting.

22        During a second consultative mental health examination . . . undertaken in January
          2013, the consultant, based upon a psychiatric interview as well as a mental status
23        examination, diagnosed [plaintiff] with a psychotic disorder, not otherwise specified
          and a mood disorder, not otherwise specified, affording him rule out diagnoses of
24        posttraumatic stress disorder, schizophrenia and intermittent explosive disorder.  He
          also afforded [plaintiff] a global assessment of functioning score of 50.  Ultimately,
25        he opined that [plaintiff] had no limitations performing simple ones, but
          moderate limitations performing complex ones.  He also opined that [plaintiff] was
26        severely impaired in terms of maintaining concentration, attendance and persistence
          as well as in terms of maintaining a normal workday/work week.  In addition, he
27        opined that [plaintiff] was moderately impaired in terms of maintaining regular
          attendance and in terms of responding to changes in the work setting.

28

[AR at 28-29 (citations omitted).]

Plaintiff's mental residual functional capacity was assessed on June 19, 2012, by reviewing psychologist Junko McWilliams, Ph.D. [AR at 97], and on January 25, 2013, by reviewing psychiatrist P.M. Balson, M.D. [AR at 128-29.] The ALJ stated the following regarding these two reports:

> The state agency evaluating mental health consultants, a psychiatrist and a psychologist, respectively, agree that [plaintiff] has moderate limitations in social functioning but no limitations in terms of his ability to perform work-related instructions. Ultimately, they opined that [plaintiff] was limited to dealing with the public, coworkers and supervisors in brief and infrequent situations. I interpreted this as limiting [plaintiff] to only occasional contact with others in the work setting.

[AR at 29 (citation omitted).]

The ALJ concluded:

> I was unable to accept the assessment that [plaintiff] has severe or moderately severe limitations in any area of basic work related mental functioning because of the lack of contemporaneous psychiatric treatment and care. In fact, . . . there is only a singular and isolated mention of psychiatric symptoms in [plaintiff's] medical treatment records.[5] I found that [plaintiff] has significant psychiatric symptoms and limitations because the state agency examining and evaluating mental health consultants are in agreement in this regard. I also afforded [plaintiff] the benefit of the doubt by limiting him to simple repetitive tasks . . . despite the fact that 3 of 4 state agency consultants found that he has no significant limitations in this area.[6] I limited [plaintiff] to occasional contact with the public, coworkers and supervisors because there is consensus amongst the state agency consultants that [plaintiff] has significant limitations in this domain. However, I cannot conclude that greater limitations in this area were warranted because, as noted above, he has received no specialized psychiatric treatment and there is virtually no mention of psychiatric symptoms or limitations in [plaintiff's] medical treatment records. If [plaintiff] had more severe limitations, particularly in social functioning, I would expect at least some acknowledgment of this by his treating medical sources.

[AR at 29.]

Although the opinion of a non-examining consultant "cannot by itself constitute substantial

---

5       As previously mentioned, the ALJ noted that this was an April 2013 treatment note reflecting a psychiatric health screening questionnaire on which plaintiff's score "was consistent with severe depression." [AR at 28 (citing AR at 532).]

6       Dr. Ijeaku, who examined plaintiff on January 12, 2013 -- almost eight months after Dr. Busnaina's report -- opined that plaintiff's ability to understand, remember, and carry out complex instructions was moderately impaired. [AR at 486.] Only Dr. Balson had the benefit of reviewing Dr. Ijeaku's report, and Dr. Balson does not discuss why he did not accept this finding. [See, e.g., AR at 124.] Nevertheless, as noted, the ALJ limited plaintiff to simple, repetitive tasks.

evidence that justifies the rejection of the opinion of either an examining physician or a treating physician," Lester, 81 F.3d at 831, state agency consultants are "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i); Soc. Sec. Ruling 96-6p; Bray v. Astrue, 554 F.3d 1219, 1221, 1227 (9th Cir. 2009) (the ALJ properly relied "in large part on the DDS physician's assessment" in determining the claimant's RFC and in rejecting the treating doctor's testimony regarding the claimant's functional limitations). Reports of non-examining consultants "may serve as substantial evidence *when they are supported by other evidence in the record and are consistent with it*." Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (emphasis added).

In this case, in light of the *lack* of specific psychiatric treatment records as found by the ALJ, the objective evidence relied on by the reviewing consultants in assessing plaintiff's mental health consisted primarily of Dr. Busnaina's and/or Dr. Ijeaku's objective assessments, as well as the functional reports completed by plaintiff and his friend.[7] However, in stark contrast to plaintiff's moderate and severe limitations assessed by Drs. Busnaina and Ijeaku respectively with regard to maintaining concentration, persistence, or pace [AR at 372, 486], both non-examining consultants found *no* impairment in this domain. [AR at 97, 129.] In fact, Dr. McWilliams, who reviewed only Dr. Busnaina's report, plaintiff's functional report, and Ms. Castellano's first functional report, and who "partially accepted" Dr. Busnaina's report, apparently rejected Dr. Busnaina's finding of moderate limitations in concentration, persistence or pace, as well as the information in the functional reports that reflected some degree of impairment in concentration [see, e.g., AR at 298, 323], and concluded that plaintiff had no such limitation. [AR at 93.] Dr. Balson, who reviewed both Dr. Busnaina's and Dr. Ijeaku's reports, as well as the functional reports, simply stated -- without explanation or record support -- that plaintiff has no sustained concentration and persistence limitations. [AR at 129.] Neither reviewer points to any affirmative

---

[7]   Antonia Castellanos, whose garage plaintiff lives in, submitted a Function Report - Adult - Third Party signed on April 2, 2012 [AR at 293-300], and another one signed on December 11, 2012. [AR at 318-26.]

evidence in the record that would support their opinions regarding plaintiff's purportedly *unimpaired* ability to maintain concentration, persistence and pace in the face of the examining physicians' findings to the contrary.  Additionally, both reviewing consultants (and the ALJ) also failed to address the opinion of Dr. Busnaina and Dr. Ijeaku that plaintiff would have moderate difficulty dealing with changes in the work setting.  [AR at 372, 486.]  The opinions of the reviewing consultants, therefore, are *not* supported by any other evidence in the record and may not serve as substantial evidence.

Furthermore, although Dr. Ijeaku did not address social limitations at all, Dr. Busnaina found that plaintiff would have moderate to severe limitations interacting with coworkers and supervisors, and moderate to severe limitations regarding workplace stress.  [AR at 372.]  Although the ALJ acknowledged that both of the reviewing consultants opined that plaintiff could interact with others if the interactions were brief and infrequent, he "interpreted" this limitation to be equivalent to allowing "occasional" contact with others.  [AR at 29.]  The Court agrees with plaintiff that while "infrequent" may be synonymous with "occasional," the ALJ's interpretation -- without explanation -- failed to take into account the opinion of both reviewing consultants that any such contact must also be "brief."  [JS at 13.]  Similarly, although not addressed by Dr. Busnaina, Dr. Ijeaku found that plaintiff would have severe difficulty completing a normal workday or work week without interruptions from psychiatrically-based symptoms, and moderate difficulty performing activities within a schedule.  [AR at 486.]  When plaintiff's counsel asked the VE whether the hypothetical individual with the added limitations of an inability to maintain concentration, attendance, and persistence, and to complete a normal workday or work week could perform any work, the VE confirmed there would be no jobs available.  [AR at 75.]  Thus, the ALJ's error in not providing specific and legitimate reasons for discounting these limitations was not harmless.

Nor is the ALJ's stated reason for discounting the opinions of Dr. Busnaina and Dr. Ijeaku legally sufficient.  In fact, the ALJ appears to have solely relied on his observation that there was "only a singular and isolated mention of psychiatric symptoms in [plaintiff's] treatment records" to support his finding that plaintiff does not have "severe or moderately severe limitations in any area of basic work related mental functioning."  [AR at 29 (citing AR at 532).]  To the contrary, in

1   addition to the fact that at least since 2011 plaintiff's treating physician had recognized he suffered

2   from depression and he had been prescribed Prozac (Fluoxetine) for his mental health issues

3   [see, e.g., AR at 389, 442], there are several additional mentions of plaintiff's mental health issues

4   and/or treatment in the record.   For instance, on August 8, 2011, depression screening was

5   positive for moderately severe depression, and a suicide risk assessment was conducted.   [AR

6   at 454-56.]   On September 1, 2011, as part of a telephonic screening of plaintiff's "presenting

7   problem and assessment of safety issues . . . in order to facilitate the scheduling of a full

8   psychiatric evaluation/intake," the medical notes reflect that plaintiff reported he is "always

9   stressing, moody, angry, mean"; experiences mood swings; and that his diabetes adds to his

10  emotional issues.[8]  [AR at 447.]   Among other things, plaintiff also reported feeling extremely

11  anxious or nervous, and stated that he was significantly depressed; experienced changes in

12  appetite; had anger problems; experienced irritability, feelings of hopelessness, and significant

13  concentration problems; and had too little energy.  [AR at 447-48.]  Plaintiff's social worker at that

14  time recommended group therapy.  [AR at 450.]  On September 22, 2011, plaintiff was treated for

15  "Depression/Irritable mood," and it was noted that with Prozac his girlfriend told him that he "acts

16  calmer."  [AR at 443.]  On April 26, 2013, depression screening was again "suggestive of severe

17  depression" [AR at 532-33]; on April 25, 2014, plaintiff reported that he felt "he would be better off

18  dead" and depression screening was again "suggestive of severe depression" [AR at 613-14]; and,

19  on July 14, 2015, plaintiff's treating physician, James Huang, M.D., noted that emotional factors

20  contribute to the severity of plaintiff's symptoms and functional limitations, and identified

21  depression and anxiety as affecting plaintiff's physical condition.  [AR at 566.]  In short, there is

22  not just one "singular and isolated" mention in the record of plaintiff's mental health issues; rather,

23  there are several and his treatment was ongoing through his primary care provider from at least

24

25

26      [8]     As noted by Dr. Balson, plaintiff's A1C test results -- a blood test that provides information

27  about a person's average levels of blood glucose over the past three months -- was 14.4 on
    September 27, 2012, and a "[l]ist of A1C [test results] for past few years shows [plaintiff's]

28  [diabetes mellitus] has been out of control for at least the past 3-4 years."  [AR at 124.]

2011.[9]  Thus, the ALJ's reason for discounting the opinions of Dr. Busnaina and Dr. Ijeaku was not supported by substantial evidence.

Remand is warranted on this issue.

# VI.

# REMAND FOR FURTHER PROCEEDINGS

The Court has discretion to remand or reverse and award benefits.  McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989).  Where no useful purpose would be served by further proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits.  See Lingenfelter v. Astrue, 504 F.3d 1028, 1041 (9th Cir. 2007); Benecke v. Barnhart, 379 F.3d 587, 595-96 (9th Cir. 2004).  Where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate.  See Benecke, 379 F.3d at 593-96.

In this case, there are outstanding issues that must be resolved before a final determination

---

[9]    Although the ALJ also opined that if plaintiff "had more severe limitations, particularly in social functioning, I would expect at least some acknowledgment of this by his treating medical sources," it appears that plaintiff's treating providers' primary concerns were (1) that plaintiff's diabetes was out of control [see, e.g., AR at 405 (A1C at 14.4 on September 27, 2012); 421 (A1C at 14.5 on June 23, 2011, and 12.0 on February 23, 2012); 527 (lab "reporting panic value of glucose level -- 648," but plaintiff refused to go to the hospital because it was his birthday weekend; he was advised about the risks but "appear[ed] to be not concern[ed] during the conversation"); 583 (A1C on April 25, 2014, at 15.7, and on October 23, 2013, it had been greater than 18); 622 (blood sugar at 720)]; (2) that he was admittedly non-compliant with his medications and diet [see, e.g., AR at 599 ("still very noncompliant with insulin injections[,] not using them"; "still drinking sodas and eating cakes"; "he stated he understands the risks of noncompliance"); 611 (had not used his insulin for 2 months)]; and (3) that he refused to "even listen" to the provider's explanation of the consequences and complications that could develop due to his out-of-control blood sugar.  [See, e.g., AR at 622 (on October 24, 2013, emergency room M.D. called plaintiff to come in to the hospital as plaintiff had reported that his blood sugar was 720 and plaintiff "adamantly" refused, informed the doctor that "he is not worried about it," and refused to listen to an explanation of the consequences); see also AR at 620 (on October 29, 2013, the R.N. called to follow up with plaintiff about his elevated blood sugar and he told her "he is 'feeling fine. I told you last week if I feel bad I will go to the hospital here and go to their ER,'" and asked that she "[t]ell Dr Huang to stop worrying about me.").]

1  can be made.   In an effort to expedite these proceedings and to avoid any confusion or

2  misunderstanding as to what the Court intends, the Court will set forth the scope of the remand

3  proceedings.   First, because the ALJ failed to provide specific and legitimate reasons for

4  discounting the opinions of Dr. Busnaina and Dr. Ijeaku, and for failing to provide specific and

5  legitimate reasons for failing to consider the social interaction limitation to "brief" as well as

6  "infrequent" as found by Dr. Balson and Dr. McWilliams, the ALJ on remand shall reassess the

7  opinions of these medical providers.   In assessing the medical opinion evidence of all of these

8  doctors, the ALJ must explain the weight afforded to each opinion and provide legally adequate

9  reasons for any portion of the opinion that the ALJ discounts or rejects, including a legally

10  sufficient explanation for crediting one doctor's opinion over any of the others.   Finally, if

11  warranted, the ALJ shall reassess plaintiff's RFC and determine at step four, with the assistance

12  of a VE if necessary, whether plaintiff is capable of performing his past relevant work as a hand

13  packager.[10]  If plaintiff is not so capable, or if the ALJ determines to make an alternative finding

14  at step five, then the ALJ shall proceed to step five and determine, with the assistance of a VE if

15  necessary, whether there are jobs existing in significant numbers in the regional and national

16  economy that plaintiff can still perform.

17  /

18  /

19  /

20  /

21  /

22  /

23  /

24  /

25  /

26

27

28  [10]   Nothing in this decision is intended to disrupt the ALJ's step four finding that plaintiff is unable to perform his other past relevant work.

**VII.**

**<u>CONCLUSION</u>**

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED:  January 23, 2017

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE

14